**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JIMMY A. SCHLIER, WRECKERS
INT'L, INC. d/b/a SCHLIER'S TOWING
& SERVICE CENTER

      Plaintiffs,

          v.

JOHN G. RICE, et al.,

      Defendants.

CIVIL ACTION No. 3:04-CV-1863

(JUDGE CAPUTO)

## MEMORANDUM

      Presently before the Court are two motions for summary judgment.  Plaintiffs

Jimmy Schlier and Wreckers International, Inc., move for partial summary judgment on

liability against Defendants Major John G. Rice and Col. Jeffrey B. Miller, in both their

individual and official capacities, for violation of Plaintiffs' First Amendment rights.  (Pls.'

Mot. for Partial Summ. J., Doc. 89.)  Defendants John G. Rice, et al., move for summary

judgment on all claims.  (Defs.' Mot. for Summ. J., Doc. 96.)  Because questions of

material fact exist regarding the liability of Defendants Rice and Miller for First

Amendment retaliation, Plaintiffs' motion for partial summary judgment will be denied.

Because no claims have been made against Defendant Sharp, she will be dismissed

from this action.  Because questions of material fact exist regarding whether Defendants

Rice, Miller, and Dougalas retaliated against Plaintiffs for exercise of their First

Amendment rights; the evidence in the record, even resolving all disputed facts in favor of

Plaintiffs, is not sufficient to make out a claim of First Amendment retaliation against

Defendants McGuire, Transue and Robb; Plaintiffs have not adduced sufficient evidence

to show that they had a property interest protected by the Fourteenth Amendment; and the evidence in the record, viewed in the light most favorable to Plaintiffs, shows a violation of Plaintiffs' clearly established rights by Defendants Rice, Miller, and Dougalas, Defendants' motion for summary judgment will be granted in part and denied in part.

## BACKGROUND

### I. Factual Background

The following facts are undisputed.  Plaintiff Jimmy A. Schlier is the owner and president of Plaintiff Wreckers International Inc., d/b/a Schlier's Towing & Service Center ("Schlier's Towing").  (Decl. of Jimmy A. Schlier, Doc. 91 ¶ 1.)  Schlier's business began performing towing services for the Pennsylvania State Police (PSP) in 1976 or 1977, and until September 2002, Plaintiffs were on the State Police's approved towing referral lists, whereby they regularly received requests from motorists and police to tow vehicles that were broken down, involved in accidents, or impounded for criminal investigations; Plaintiffs also regularly performed towing and repair services on police vehicles.  (Pls.' Statement of Undisputed Material Facts, Doc. 90 ¶¶ 2, 5, 13 [hereinafter Pls.' Statement]; Defs.' Counterstatement of Undisputed Material Facts, Doc. 107 ¶¶ 2, 5, 13 [hereinafter Defs.' Counterstatement].)

Defendants are Colonel Jeffrey Miller, Commissioner of the PSP; Major John Rice, Commander of Area V and, in 2002, before his promotion from captain, the commanding officer of Troop N, which includes five (5) stations; Lieutenant David Dougalas, the station commander of the Swiftwater barracks of Troop N; Daniel McGuire, assistant counsel at

2

the State Police Office of Chief Counsel (OCC) beginning April 8, 2002[1]; Lieutenant

Colonel Cynthia Transue, Commander of Area V in 2002; Joe Robb, Director of the

Bureau of Vehicle Management in the Department of General Services (DGS) in 2002;

and Josie Sharp, current Director of Vehicle Management in the DGS.  (Pls.' Statement

¶¶ 8-10; Defs.' Counterstatement ¶¶ 8-10; Pls.' Second Am. & Supplemental Compl,

Doc. 67, ¶¶ 6, 11; Defs.' Answer to Second Am. & Supplemental Compl., Doc. 103 ¶¶ 6,

11; Dep. of Daniel McGuire, Doc. 122-7, at 15: 2-10, 143: 3-8.)

In February 2001, the PSP adopted Field Regulation 6-2, which regulated the

provision of emergency towing services.  It provided troop commanders with authority to

suspend towing operators from the referral lists for a number of reasons, including failure

to maintain the regulation's standards; commission of an act involving dishonesty or

corruption when it affects the health, welfare, or safety of others; overcharging for

services, to be determined in conjunction with the fee schedule the operator submitted its

application; or repeated conduct that tends to demean the public image of the Police.

(Defs.' Statement of Undisputed Material Facts, Doc. 122 ¶¶ 3-4 [hereinafter Defs.'

Statement]; Pls.' Counterstatement of Facts, Doc. 137 ¶¶ 3-4 [hereinafter Pls.'

Counterstatement].)

In late 2001 or early 2002, disputes developed between Plaintiff Schlier and the

PSP about billing.  (*See* Pls.' Statement ¶ 15; Defs.' Counterstatement ¶ 15.)  In January

---

[1]

On page 15 of his deposition, Mr. McGuire stated that he began work in the OCC
on April 8, 2003, but he appears to have misspoken, as other parts of the record
show he was employed in the OCC during 2002 and on page 143 of his
deposition, he did not correct the attorney who referred to April 2002 as
McGuire's first month with OCC.

2002, Mr. Schlier had a series of conversations with Representative Kelly Lewis, discussing trouble he was having getting paid for towing operations.  (Dep. of Jimmy Schlier, Oct. 19, 2005, Doc. 140-6, at 61-64.)  In response to a price that the Police thought exorbitant and a complaint filed against Schlier's Towing by another company, which led to an investigation into possible deceptive practices by Schlier's Towing, the PSP decided to no longer use Schiler's services exclusively but to seek out the best price each time towing services were needed.  (*See* Defs.' Statement ¶¶ 12-18; Pls.' Counterstatement ¶¶ 12-18.)  Mr. Schlier called then-Captain Rice to express concern that his services were no longer being used, and Rice informed him of the decision; at this point, Schlier complained of unpaid bills and Rice told Schlier to forward any such bills to Rice for his evaluation.  (Defs.' Statement ¶¶ 18-19; Pls.' Counterstatement ¶¶ 18-19.)  Schlier then sent more than sixty (60) bills totaling thirty-three thousand, three hundred twenty-five dollars and seventy-five cents ($33,325.75).  (Pls.' Statement ¶ 17; Defs.' Counterstatement ¶ 15.)

On April 27, 2002, Plaintiff Schlier sent a formal complaint to the Director of the Division of Internal Affairs, which investigates reports of misconduct, alleging that the Swiftwater barracks had failed to pay bills and had improperly directed towing business to another towing operator owned by a convicted felon. (Pls.' Statement ¶¶ 18-21; Defs.' Counterstatement ¶¶ 18-21.)  This complaint was forwarded to Rice by May 22, 2002. (Pls.' Statement ¶ 23; Defs.' Counterstatement ¶ 23.)  Rice later asked his personnel to survey Plaintiffs' rates, and after a survey, Lieutenant Dougalas reported to Rice that Plaintiffs' rates were two (2) to four (4) times higher than competitors'.  (Defs.' Statement ¶¶ 25-27; Pls.' Counterstatement ¶¶ 25-27.)  Although this much is undisputed, Plaintiffs

4

dispute Dougalas' conclusion itself and even dispute that Dougalas believed it.  (Pls.' Counterstatement ¶ 26.)

On August 27, 2002, Rice informed Plaintiff that his company would be removed from all Troop N referral lists effective September 6, 2002.  Rice informed Plaintiff that his decision was based on four factors: (1) Schlier's Towing failed to meet the requirement of charging reasonable and customary fees; (2) the company demeaned the image of the State Police by falsely communicating to another business that it had a contract with the Police and that the Police approved of its billing practices; (3) a complaint filed by that other company against Schlier's Towing resulted in a criminal investigation into deceptive or fraudulent business practices; and (4) Schliers's Towing submitted invoices to the Police totaling thirty-three thousand, three hundred twenty-five dollars and seventy-five cents ($33,325.75) but the State Police do not act as guarantor of the expenses that motorists may owe to emergency towing operators and the Police will not assume responsibility for the expenses.  Finally, Rice informed Plaintiff that he could apply for reinstatement after six (6) months, contingent upon taking "appropriate remedial action so that [your business] will not conflict with the standards required by the Pennsylvania State Police."  (Pls.' Statement ¶¶ 24-25; Defs.' Counterstatement ¶¶ 24-25.)  The criminal investigation of Schlier's Towing ended September 26, 2002, after the district attorney declined prosecution.  (Pls.' Statement ¶ 53; Defs.' Counterstatement ¶ 53.)

On November 15, 2002, Schlier's Towing filed an action with the Pennsylvania Board of Claims against the PSP to recover the charges it claimed it was owed, and the Board of Claims entered an opinion sustaining Plaintiffs' claim as stating a cause of action for breach of an implied-in-fact contract or an implied-in-law contract.  (Pls.'

Statement ¶¶ 54-55; Defs.' Counterstatement ¶¶ 54-55.)  In March 2003, Plaintiffs unsuccessfully applied for reinstatement to the Police referral lists.  (Pls.' Statement ¶¶ 57-60, 62-64; Defs.' Counterstatement ¶¶ 57-60, 62-64.)

In March 2006, Plaintiffs, through counsel, sent a letter to Colonel Miller complaining that the PSP had removed them from the referral lists in retaliation for exercise of their First Amendment rights to petition the government for redress of grievances, namely, for submitting the invoices.  Plaintiffs argued in the letter that the reasons Rice gave for the suspension were pretextual.  (Pls.' Statement ¶ 67; Defs.' Counterstatement ¶ 67.)  An assistant counsel with the State Police then wrote to Plaintiffs' counsel that his letter was best directed not to Miller but to the Office of Attorney General, which represented the Defendants, as that he would forward it there. (Pls.' Statement ¶ 68; Defs.' Counterstatement ¶ 68.)

In August of 2006, after Plaintiffs moved for a preliminary injunction ordering Colonel Miller and Major Rice to reinstate them to the towing referral lists, the parties agreed to a rate schedule and Plaintiffs were reinstated to the lists.  (Pls.' Statement ¶¶ 70-75; Defs.' Counterstatement ¶¶ 70-75.)  As both parties have moved for summary judgment, disputed facts will be discussed below in the context of each party's motion.

## II.  Procedural Background

Plaintiffs filed their Complaint on August 20, 2004.  (Doc. 1.)  Plaintiffs filed their Amended Complaint (Doc 18), mooting Defendants' initial Motion to Dismiss (Doc. 13). Defendants then moved to dismiss the Amended Complaint (Doc. 20), and this Court denied that motion in its Memorandum and Order of February 16, 2006.   (Doc. 29).

Plaintiffs later filed their Second Amended and Supplemental Complaint on October 25, 2006.  (Doc. 67.)  Defendants moved to dismiss Count III of that Complaint (Doc. 76.), and this Court denied their motion in its Memorandum and Order of January 11, 2007.  (Doc. 99.)  Defendants filed their Answer to the Second Amended and Supplemental Complaint on January 25, 2007.  (Doc. 103.)

Both parties now move for summary judgment.  Plaintiffs move for partial summary judgment on liability against Major Rice and Colonel Miller, in their individual and official capacities, for violating Plaintiffs' First Amendment rights.  (Pls.' Mot. for Partial Summ. J., Doc. 89.)  Defendants move for summary judgment on all claims.  (Defs.' Mot. for Summ. J., Doc. 96.)  These motions are fully briefed and ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law.  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one.  *See id.* at 248.  An issue of material fact is genuine if "a reasonable jury

could return a verdict for the nonmoving party." *Id.*

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *See White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *See Anderson*, 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**DISCUSSION**

Plaintiffs' claims for violations of their First and Fourth Amendment rights are brought pursuant to 42 U.S.C. § 1983, under which, every person who, under color of state law, subjects another to the deprivation of any federal right shall be liable to the party injured.  Plaintiffs argue, in their motion for partial summary judgment, that no genuine dispute of material fact exists as to whether Defendant Rice retaliated against Plaintiffs for the petition they filed with the state Board of Claims by not reinstating them to police referral lists, and that no evidence of any other reason for non-reinstatement exists.  (Br. in Supp. Pls.' Mot. for Partial Summ. J., Doc. 92, at 5.)  Plaintiffs also claim that no genuine dispute of material fact exists as to whether Defendant Colonel Miller "knew of and disregarded," or "knowingly acquiesced" in violations of Plaintiffs' civil rights by Defendant Rice and others.  (*Id.* at 15.)

Defendants argue that they are entitled to summary judgment as to Plaintiff's First Amendment retaliation claim and Plaintiffs' Fourteenth Amendment due process claim, and that, in the alternative, all Defendants are entitled to qualified immunity from suit.  (Defs.' Br. in Supp. of Mot. for Summ. J., Doc. 121.)  These arguments will be addressed in turn.

**I. Plaintiffs' Motion for Partial Summary Judgment**

**A. Defendant Rice's Liability for First Amendment Retaliation**

Plaintiffs move for summary judgment that Major Rice retaliated against them for exercise of their First Amendment rights.  Although Plaintiffs were not employees of

9

Defendants, the Supreme Court has held that the line of cases addressing retaliation against public employees based on political affiliation applied not only to employees but also to independent contractors and to service providers who are "removed from an official list of contractors authorized to perform public services." *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996).  It follows, then, that cases addressing retaliation against public employees for exercising their rights under the Petition and Speech Clauses of the First Amendment should apply here.  Indeed, both parties have made their arguments within that framework, which involves a three-part inquiry.  First, the plaintiff must establish that (1) he was engaged in activity protected under the First Amendment and (2) that activity was a "substantial factor" in the defendant's allegedly retaliatory action.    *San Filippo v. Bongiovanna*, 30 F.3d 424, 430-31 & n.7 (3d Cir. 1994).  To succeed on this second prong, Plaintiffs do not have to show "but-for" causation; rather, they must show only that "the exercise of [their] First Amendment rights played some substantial role in the relevant decision." *Suppan v. Dadonna*, 203 F.3d 228, 236 (3d Cir. 2000).  If Plaintiff does this, the burden of persuasion shifts to the defendant, who "may defeat plaintiff's claim by demonstrating that the same action would have taken place even in the absence of the protected conduct." *San Filippo*, 30 F.3d at 430-31 & n.7.  This framework is borrowed from *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, in which the defendant must demonstrate the third prong by a preponderance of the evidence. *See* 429 U.S. 274, 287 (1977).

Regarding the first prong, filing non-sham petitions for redress from government is protected under the Petition Clause of the First Amendment, without regard to whether

10

the petition addresses a matter of public concern.  *Eichenlaub v. Twp. of Indiana*, 385

F.3d 274, 284 n.7 (3d Cir. 2004) (discussing *San Filippo*).  Not every communication

protesting governmental acts or omissions is a "petition" within the protection of the First

Amendment, but "when government ... formally adopts a mechanism for redress of those

grievances for which government is allegedly accountable," the Petition Clause does

protect those who take advantage of that mechanism.  *San Filippo*, 30 F.3d at 442.

Formal mechanisms include a collective bargaining agreement's grievance procedure

and a state's waiver of sovereign immunity in its courts.  *Id.*  Defendants do not dispute

that the action Plaintiffs brought against the State Police with the Pennsylvania Board of

Claims on November 15, 2002 was protected activity.  (Defs.' Br. in Opp'n to Pls.' Partial

Mot. for Summ. J., Doc. 108, at 13.)  Additionally, the complaint Plaintiffs filed earlier, on

April 27, 2002, with the Director of the Division of Internal Affairs, was also protected

activity, as both parties agree that the Division of Internal Affairs "was established to

investigate reports of misconduct."  (Pls.' Statement ¶¶ 18-19; Defs.' Counterstatement

¶¶ 18-19.)

　　　　Regarding the second prong, Plaintiffs claim that their protected activity was a

substantial factor in the decision not to reinstate them to towing referral lists when they

reapplied in March of 2003 because "there is no evidence of any other reason for non-

reinstatement."  (*See* Br. in Supp. of Mot. for Partial Summ. J., Doc. 92, at 5.)  Rice did

note Schlier's suit for recovery of certain expenses as a reason for not reinstating him,

but explained that it was what the theory of that suit revealed about Schlier's perception

of his financial dealings with the Police, not the fact that the suit was brought, which

caused Rice to not reinstate Schlier's Towing.  (*See* Rice Decl., Doc. 107-2 ¶ 35. ("I'd

suspended Schlier, in part, because he began demanding payments from PSP, under his

'implied contract' concept, for towing services chargeable to vehicle owners, ....  Thus, by

filing suit against PSP, Schlier had obviously failed to take appropriate remedial action ....

Good business sense would prevent me from reinstating Schlier to the towing referral list

so long as he believed the PSP had an obligation to pay bills of third parties when called

by the PSP.").)

Rice also added, "in any event, so long as Schlier litigated his dispute against

PSP, I believed I should defer to the advice and recommendations of OCC attorneys."

(*Id.*)  One of those attorneys, Daniel McGuire, advised Rice to remove Plaintiffs if it could

be established that their rates were significantly higher than others in the area.  (Letter

from Daniel McGuire, Assistant Counsel, OCC, to Captain John Rice, Commanding

Officer, Troop N Hazleton (May 16, 2002) Doc. 139-2 ¶ 10.)  While these statements are

some evidence that Plaintiffs' protected activity played some substantial role in Rice's

decision, it does not resolve all disputed issues of material fact such that Plaintiffs are

entitled to summary judgment.  Following counsel's advice with regard to ongoing

litigation is not synonymous with retaliating against the opposing party in that litigation.

Viewing this evidence in the light most favorable to Defendant Rice, the Court cannot

conclude that the aspect of Plaintiffs lawsuit that played any substantial role in

Defendant's decision was the fact that Plaintiffs exercised their First Amendment rights

and not Schlier's implied contract theory, which made Rice believe that it would not make

"good business sense" to hire Schlier in the future.  The Court cannot conclude that no

material disputes of fact exist as to whether Plaintiffs' exercise of protected activity played

a substantial role in Defendant's decision.  Because of these factual disputes regarding the second prong, it is not necessary to address the third prong, and Plaintiffs' motion for summary judgment as to Defendant Rice will be denied.

### B. Defendant Miller's Liability for First Amendment Retaliation

Plaintiffs move for summary judgment that Colonel Miller is liable, through supervisory liability, for retaliating against Plaintiffs for their exercise of First Amendment rights.  In order to be liable under § 1983, the defendant must have personal involvement in the alleged wrongdoing.  *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). "Supervisory liability cannot be based solely upon the doctrine of respondeat superior." *Andrews v. City of Phila.*, 895 F.2d 1469, 1478 (3d Cir. 1990).  Rather, to hold a superior liable under § 1983 for the unconstitutional activities of one of his subordinates, a plaintiff must establish a causal connection between the superior's actions and the subordinate's unconstitutional activity.  *See Black v. Stephens*, 662 F.2d 181, 189-91 (3d Cir. 1981), *cert. denied*, 455 U.S. 1008 (1982).  To establish this connection, Plaintiffs seek to show that Defendant Miller had "personal knowledge of and acquiescence in, support of, or encouragement of" unconstitutional conduct.  *See Beckett v. McFadden*, Civ. A. No. 92-2079, 1993 U.S. Dist. LEXIS 5689, at *16 (E.D. Pa. Apr. 26, 1993); *see also Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

But the factual dispute as to whether Rice violated Plaintiffs' constitutional rights, discussed above, is also material to the question of Miller's liability.  If there was no unconstitutional conduct, then Miller never acquiesced in any unconstitutional conduct.

13

Because of this genuine dispute of material fact, Plaintiffs' motion for summary judgment as to Defendant Miller will be denied.

## II. Defendants' Motion for Summary Judgment

At the outset, the Court notes that none of the three (3) counts in Plaintiffs' Second Amended and Supplemental Complaint have been brought against Josie Sharp, even though Ms. Sharp is listed as a Defendant in her official capacity and Plaintiffs seek prospective injunctive relief from her.  (*See* Second Am. & Supplemental Compl., Doc. 67 ¶¶ 11, 13, 79.)  As Plaintiffs failed to state any claim against Ms. Sharp, she will be dismissed from this suit.

### A. Plaintiff's First Amendment Claim

Defendants move for summary judgment on Plaintiffs' First Amendment claim, which Plaintiffs bring against all remaining Defendants: Major Rice, Colonel Miller, Lieutenant Dougalas, Mr. McGuire, Colonel Transue, and Mr. Robb.  As to the first prong of the inquiry, as discussed above, there is no dispute that Plaintiffs engaged in at least some protected activity.  As to the second and third prongs, each Defendant will be discussed in turn.

#### (i) Major Rice.

As discussed above, the evidence in the record viewed in the light most favorable to the nonmoving party, Plaintiffs, indicates that Major Rice made the decision, when he

was Troop Commander, not to reinstate Plaintiffs to the referral lists.  (*See* Rice Decl.,

Doc 107-2 ¶ 32).  Furthermore, Major Rice agreed that it was he who caused Schlier's

Towing to be removed from the referral list of Fern Ridge barracks after it was temporarily

added back onto that list.  (Dep. of Major John C. Rice, May 24, 2005, Doc. 93-8, at 177:

17-25.)  Thus, Rice is not entitled to summary judgment on the ground that he did not

make the decisions Plaintiffs challenge.

　　　Rice could be entitled to summary judgment in one of two ways.  Under the

second prong, he could show that, even viewing all evidence in the record in the light

most favorable to Plaintiffs, their protected activity was not a substantial factor in his

decision not to reinstate them, meaning, it did not even play "some substantial role."

*Suppan*, 203 F.3d at 236.  Or, under the third prong, he could show by a preponderance

of the evidence that, even viewing all evidence in the light most favorable to Plaintiffs, he

would have made the same decision regardless of the protected activity.

　　　As discussed above, there are factual disputes surrounding the reason Rice chose

not to reinstate Plaintiffs.  In his own declaration, he made clear that Plaintiffs' lawsuit

played a role in the decision.  What was not clear was whether Rice made the decision

because of the fact that Plaintiffs exercised their rights under the Petition Clause in filing

the suit or because the nature of the suit gave Rice reason to believe that Schlier had not

changed his opinion that the Police must pay for some emergency tows performed for

third party motorists – an opinion that was one of Rice's reasons for suspending Schlier's

Towing in the first place.  In light of this factual dispute, and in light of the fact that

Plaintiffs need not show "but-for" causation, but only that protected activity played "some

substantial" role in Rice's decision, Rice is not entitled to summary judgment under the

15

second prong.

Likewise, Rice is not entitled to summary judgment under the third prong. Although all he must show is the lack of but-for cause, namely, that he would have failed to reinstate Plaintiffs regardless of their protected activity, he must make that showing based on the evidence viewed in the light most favorable to Plaintiffs.  That evidence shows that, but for Plaintiffs' suit, Rice would not have found out that Plaintiff continued to pursue his implied contract theory – the theory that gave Rice reason to believe Schlier thought himself entitled to compensation from the Police for services provided to third parties – which meant to Rice that reinstating Plaintiffs would be exercising poor business judgment.  It is true that Rice stated that one reason he did not reinstate Plaintiffs was that Schlier did not explain in his application for reinstatement how he had remedied the conditions that first caused him to be suspended.  (Rice Decl., Doc. 107-2 ¶ 28.)  But he also stated that it was the lawsuit that demonstrated to him Plaintiffs' lack of remedial action.  (*Id.* ¶ 35.)  Thus, whether Rice chose not to reinstate Plaintiffs because of retaliation or out of concern for the future financial stability of the Police, the Court cannot conclude that but for the lawsuit, Plaintiffs still would not have been reinstated.  Because questions of material fact exist as to the reason for Defendant Rice's decision not to reinstate Plaintiffs, the Court will deny Defendants' motion for summary judgment on the First Amendment claim as to Defendant Rice.

### (ii) Colonel Miller

As discussed above, "[s]upervisory liability cannot be based solely upon the

doctrine of respondeat superior." *Andrews*, 895 F.2d at 1478. To hold a superior liable under § 1983 for the unconstitutional activities of one of his subordinates, a plaintiff must establish a causal connection between the superior's actions and the subordinate's unconstitutional activity. *See Black*, 662 F.2d at 189-91. Plaintiffs admit that Miller played no role in the decisions to remove Plaintiffs from the emergency towing referral lists and not to reinstate them. (Defs.' Statement ¶¶ 55-56; Pls.' Counterstatement ¶¶ 55-56.) Plaintiff's theory, instead, is that Defendant Miller had "personal knowledge of and acquiescence in" unconstitutional conduct. *See Beckett*, Civ. A. No. 92-2079, 1993 U.S. Dist. LEXIS 5689, at *16; *see also Rode*, 845 F.2d at 1207 (discussing "actual knowledge and acquiescence"). They allege that Colonel Miller's retaliatory act was his failure to "take corrective action after learning on March 13, 2006, that his subordinates had violated plaintiffs' First Amendment rights." (Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J., Doc. 136, at 31.) He learned of the violations, Plaintiffs argue, in a letter their counsel sent him on March 9, 2003, describing and complaining of the allegedly unconstitutional actions of Miller's subordinates. (Pls.' Statement ¶ 67; Defs.' Counterstatement ¶ 67.)

Defendants claim that Miller cannot be held liable because he had no "actual knowledge" of the allegedly unconstitutional conduct, because he never read the letter himself. As the letter referenced ongoing litigation, it was automatically forwarded to the OCC, which represented Miller. An attorney in the OCC responded to the letter, asking Plaintiffs' counsel to refrain from directly communicating with the Commissioner and instead to direct communications to the OCC. (Letter from R.H. Hawn, Assistant Counsel, OCC, to Cletus P. Lyman, Attorney for Plaintiffs (Mar. 20, 2006), Doc. 72-2.)

17

Further, the letter said, "[y]ou may be assured that we will convey your concerns to our clients, as warranted." (*Id.*)

Plaintiffs argue, however, that even if Miller never read their letter, he still had knowledge of their complaints because the knowledge of an attorney is imputed to the client. (Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J., Doc 136, at 31.) *See, e.g.*, *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994) (holding that an attorney's knowledge of matters related to the representation is generally imputed to the client because of the agency relationship). The Restatement (Third) of Agency, section 5.03, states that "[i]f an agent has actual knowledge of a fact, the principal is charged with the legal consequences of having actual knowledge of the fact." Colonel Miller's attorneys in the OCC, including R.H. Hawn, had actual knowledge of the fact that Miller's subordinates were being accused of unconstitutional conduct, so Miller must be charged with the legal consequences of having actual knowledge of that fact. And, as Defendants have not shown that no genuine issue of material fact exists as to whether failure to respond to the letter is sufficient acquiescence to be actionable, their motion for summary judgment on Defendant Miller's liability will be denied.

### (iii) Lieutenant Dougalas

Lt. Dougalas was the station commander of the Swiftwater barracks and stepped in for Rice as acting Troop Commander of Troop N from about April 2002 until July of 2002. (Dep. of David Dougalas, Doc. 122-5, at 10: 16-24.) Plaintiffs have alleged that they engaged in protected activity when they met with Representative Lewis, a meeting

18

Mr. Schlier referred to in his subsequent Internal Affairs complaint; when they sent

invoices of unpaid bills to the PSP in early 2002; when they filed a formal complaint, of

which Dougalas and his Swiftwater barracks were the principal subject, with the PSP

Internal Affairs Division on April 27, 2002; and when they filed suit with the Pennsylvania

Board of Claims for recovery of the expenses in those invoices on November 15, 2002.

The substance of their claim against Defendant Dougalas is that these activities were a

substantial factor motivating three allegedly retaliatory actions of Lt. Dougalas: (1) being

heavily involved in the events leading to Plaintiffs' removal from the referral lists by

having supervisory authority over the criminal investigation, which Plaintiffs claim was

"trumped up," that Swiftwater barracks commenced against Plaintiffs in April 2002; (2)

being heavily involved in the events leading to Plaintiffs' removal by conducting the rate

survey in the Spring of 2002 and reporting – incorrectly, Plaintiffs claim – to Rice that

Plaintiffs charged rates far in excess of their competitors; and (3) being instrumental in

causing Rice to remove Plaintiffs from the Fern Ridge station referral list in June 2003,

after Plaintiffs were temporarily reinstated to that list.

      In August 2002, when Rice first removed Plaintiffs from the lists, and in June 2003,

when Rice caused them to be removed from the Fern Ridge list, Lt. Dougalas was no

longer acting Troop Commander and did not have the authority to remove Plaintiffs.

(Decl. of David Dougalas, 2006, Doc. 122-4 ¶¶ 13-14.)  Plaintiffs assert only that he

provided information to Rice that caused Rice to remove Plaintiffs.  Yet, guidance from

other circuits provides that "[e]ven if the ultimate decision-maker can establish that the

adverse action was not in retaliation for protected conduct, a subordinate with a

retaliatory motive can be liable 'if an improper motive sets in motion the events that lead

to termination that would not otherwise occur." *Strahan v. Kirkland*, 287 F.3d 821, 826 (9th Cir. 2002) (citing *Gilbrook v. City of Westminster*, 177 F.3d 839, 854-55 (9th Cir. 1999)); *see also Prof'l Ass'n of Coll. Educators v. El Paso County Cmty. Coll. Dist.*, 730 F.2d 258, 266 (5th Cir. 1984) (holding liable a college president who recommended discharge in retaliation for protected activity, even though board that made final decision had proper motive).  Until guidance from the Third Circuit Court of Appeals on this issue, this Court will follow the guidance of the Fifth and Ninth Circuits.  There is evidence Lt. Dougalas' alleged actions influenced Rice's decision to remove Plaintiffs from the lists: Rice's letter to Plaintiff cited two (2) aspects of the criminal investigation and unreasonable rates as three (3) of the four (4) reasons for removing Plaintiffs.  Thus, it cannot be said that these actions are insufficient as a matter of law to be actionable.  And Plaintiffs have adduced evidence to support their allegations.  There is evidence, for instance, that the investigation into Schlier's Towing was continued even months after police investigators concluded, by May 2, 2002, that "there's nothing [to the charges]. They've adjusted the bill.  It looks like a billing error.  It doesn't look like anybody was trying to steal here."  (Dep. of Sergeant Donald Fernbach, Dec. 7, 2006, Doc. 93-3, at 76: 8-12.)  Questions of fact remain as to Dougalas' level of direct involvement in the investigation; he testified that he did not have anything to do with it (Dep. of David Dougalas, May 25, 2005, Doc. 93-4, at 126: 16-21.), but it was conducted by his station. Plaintiffs have also submitted evidence regarding the reasonableness of their rates when compared to competitors' and the compliance of their rates with their fee schedule, which the Police had earlier approved, raising a question of fact as to whether Dougalas' rate survey was conducted in good faith and whether his conclusions were based on fact or

on retaliatory motive.  (*See* Pls.' Counterstatement, at 27-30 (citing Schlier Decl., Doc. 91 ¶¶ 5-7; Dougalas 2006 Dep., Doc. 122-4, at 93, 100, 148; Dougalas 2005 Dep., Doc. 93-4; Letter from Lt. David Dougalas, Station Commander, Swiftwater Barracks, to Schlier's Towing (May 16, 2001), Doc. 139-12)).

Questions of fact also exist as to what Lt. Dougalas knew about Plaintiffs' protected activity at the time of his actions.  Plaintiffs' formal complaint, which was protected activity, occurred on April 27, 2002, and the investigation into Plaintiffs continued until late September 2002.  Further, while serving as acting Troop Commander, Lt. Dougalas learned about the invoices Plaintiffs sent.  He opened the bills, discussed them with Rice and forwarded them to the OCC for advice about the department's obligation to pay them.  (Dougalas Decl., Doc. 122-4 ¶ 10.)  Even if the sending of these invoices was not protected activity under the petition clause, a question of fact remains as to whether Dougalas knew of Plaintiff's earlier meetings with Representative Lewis, which are protected.  Finally, as Dougalas' memory of when he conducted the rate survey fails him (*see* Dougalas 2005 Dep. at 126-29.), a question of fact remains as to whether he conducted it before or after Plaintiffs' April 27, 2002 formal complaint.  This question is material to whether he conducted it in retaliation for that complaint.  Because these questions of fact just outlined are material to Plaintiffs' claim against Defendant Dougalas, the Court will deny his motion for summary judgment.

### (iv) Mr. McGuire

Defendants move for summary judgment in favor of Defendant Daniel McGuire,

who was assistant counsel in the OCC beginning in April 2002, arguing that he took no action at all with regard to Plaintiffs, because he was not a policymaker and provided only legal counsel to decisionmakers.  The record does indicate that the decision not to reinstate Schlier's Towing was made by Defendant Rice, who was the member of the PSP with the authority to make that decision, and not by Mr. McGuire.  (Rice Decl., Doc. 122-2 ¶¶ 32-36.)   The decision, Mr. McGuire testified, was one that "would have been made by one of the commanding officers of the State Police."  (Dep. of Daniel McGuire, Esq., Doc. 122-7, at 101: 22-25, 102: 1-3.)  "The decision would not rest with the Office of General Counsel" as "[w]e provide legal counsel and they [State Police] make policy decisions."  (*Id.* at 114: 13-14, 116: 21-22.)

This division of authority notwithstanding,  "a subordinate with a retaliatory motive can be liable 'if an improper motive sets in motion the events that lead to termination that would not otherwise occur."  *Strahan v. Kirkland*, 287 F.3d 821, 826 (9th Cir. 2002) (citing *Gilbrook v. City of Westminster*, 177 F.3d 839, 854-55 (9th Cir. 1999)); *see also Prof'l Ass'n of Coll. Educators v. El Paso County Cmty. Coll. Dist.*, 730 F.2d 258, 266 (5th Cir. 1984).  Furthermore, counsel for the PSP have been sued before for retaliatory actions allegedly taken against their clients' opponents.  In *Ober v. Brown*, the Third Circuit Court of Appeals upheld dismissal of a complaint in such a case, but not because of any rule that counsel acting in a representative capacity cannot be liable for retaliatory conduct. *See* 105 Fed. Appx. 345, at *2 (3d Cir. 2004).  Rather, dismissal was upheld simply because Plaintiff did not sufficiently allege that the defendants' actions were retaliatory. Indeed, the court said that "whether defendants acted within the scope of their

representation has no bearing on the question of whether their conduct was retaliatory."
*Id.*  While neither of these authorities is directly on point, both guide this Court to the
conclusion that even though Mr. McGuire was not a final decisionmaker and even though
he was providing legal counsel outside the direct line of command, he may be liable for
retaliation if his actions and motivations were indeed retaliatory.

　　Concerning McGuire's actions, Major Rice consulted with the OCC in his decision
not to reinstate Schlier's Towing, and when discussing his reasoning for not reinstating
Plaintiffs, he stated in part that he "believ[ed he] should defer to the advice and
recommendations of OCC attorneys."   (Rice Decl., Doc. 122-2 ¶ 36.)  And in a letter to
Rice, Mr. McGuire advised the PSP to "remove Schlier's Towing from our emergency-
towing operator referral list if it can be adequately established that their rates are
significantly higher than other operators in the area."  (Letter from Daniel McGuire,
Assistant Counsel, OCC, to Captain John Rice, Commanding Officer, Troop N Hazleton
(May 16, 2002) Doc. 139-19 ¶ 10.)  McGuire also cited aspects of the then-ongoing
investigation into Schlier's Towing as appropriate grounds for removal.  (*Id.*)  This
evidence at the least creates a question of fact as to whether Mr. McGuire's advice set in
motion events that lead to Plaintiffs not being reinstated.

　　As a question of fact exists regarding these actions, McGuire is not entitled to
summary judgment if a question also exists regarding whether retaliation for Plaintiffs'
protected activity was a substantial factor motivating him to give such advice.  Relevant to
that issue, McGuire was aware of Schlier's April 27, 2002 formal complaint, as Defendant
Rice forwarded him a copy of it on May 16, 2002.  (Fax from Captain John Rice to Daniel
McGuire, Office of Chief Counsel (May 16, 2002) Doc. 122-9.)  He was also advised that

Mr. Schlier had filed a complaint with the Board of Claims.  (McGuire Dep., Doc. 122-7, at

145: 3-22.)  In addition to McGuire's awareness of these protected activities, Plaintiffs

argue that four factors demonstrate his retaliatory animus: (1) the May 16, 2002 letter to

Rice, cited above, (2) a May 17, 2002 letter from McGuire to Plaintiffs refusing payment

of invoices, (3) the deposition testimony of Rice, and (4) Plaintiff's averment that McGuire

had Rice add to the letter informing Schlier of his removal a fourth rationale: the sending

of invoices.  (*See* Supplement to Pls.' Opp'n to Mot. for Summ. J., Doc. 144 ¶ 20.)

　　None of these pieces of evidence, however, creates a question of fact that

retaliation for Plaintiffs' protected activity was a substantial factor motivating McGuire's

decision to advise the PSP not to do business with Plaintiffs.  First, the May 16 letter was

a response to a request for a legal opinion about Plaintiffs' suit against the PSP for

recovery of expenses.  It analyzed the legal bases of Plaintiffs' claim, advised that

sending a "unequivocal notification of the denial of PSP's intent to pay the expenses

billed" as "necessary in order to begin the statute of limitations running," and advised that

the PSP remove Schlier's Towing from the referral lists only "if it can be adequately

established that their rates are significantly higher than other operators in the area."

(Letter from Daniel McGuire, assistant counsel, Office of Chief Counsel, to Captain John

Rice, Commanding Officer, Troop N Hazleton (May 16, 2002) Doc. 139-19 ¶¶ 7, 10.)  The

letter dispassionately advised the PSP about the lawsuit pending against it and advised

the PSP to act within the confines of Field Regulation 6-2.  It does not create a question

of fact as to retaliatory animus.

　　Second, the letter Mr. McGuire wrote to Mr. Schlier on May 17, 2002 simply

informed Mr. Schlier that there is no contractual relationship existed between Schlier's

Towing and the PSP and that the PSP would not assume any financial responsibility for the invoices Schlier sent.  (Letter from Daniel McGuire, Assistant Counsel, OCC, to Schlier's Towing (May 17, 2002), Doc. 122-8.)  Like the May 16 letter, this letter does not present evidence of retaliatory motive.

Third, it is unclear what part of Major Rice's deposition testimony Plaintiffs refer to, but if it is to his testimony that he relied in part on advice from the OCC in his decisions, which is cited above, it may be evidence that Mr. McGuire took some action with relation to Plaintiffs but it presents no evidence that he acted out of retaliation.

Finally, Plaintiffs presented evidence that it was McGuire, or at least someone in the OCC, who caused Major Rice to add a fourth reason for removal, the sending of invoices, to his August 2002 letter to Schlier.  (*See* Rice Dep., Doc. 145-2, at 153: 3-25; 154: 1-12.))  But again, Plaintiffs have not articulated how this action is evidence that McGuire's legal advice to the PSP was motivated by retaliation.  Indeed, as his correspondence with Rice, quoted above, indicates, McGuire thought it important to the defense of the pending suit that the PSP unequivocally inform Schlier that the PSP was not responsible for the towing expenses of third-party motorists.

As Plaintiffs have failed to put forth evidence creating a question of fact material to the issue of retaliatory motive on the party of McGuire, Defendants' motion for summary judgment as to Defendant McGuire will be granted.


### (v) Lieutenant Colonel Transue

In January 2002, defendant Cynthia Transue was promoted to Major and became

Area Commander overseeing Troop M, Troop N, and Troop K.  In January 2003, she was promoted to Lieutenant Colonel and became Deputy Commissioner of Administration. (Defs.' Statement  ¶¶ 43-44; Pls.' Counterstatement ¶¶ 43-44.)  In September 2002, the month after Rice informed Plaintiffs they were removed from the referral lists, Rice discussed this decision with Transue and she concurred in his decision.  (Defs.' Statement ¶ 46; Pls.' Counterstatement  ¶ 46.)  It is undisputed that Transue was not involved in the decision not to reinstate Plaintiffs to the lists in 2003, and it is not disputed that Transue believed that Rice was the one with the authority to reinstate Plaintiffs and that, after her January 2003 promotion, she was not in any chain of command that would have had authority to reinstate Plaintiffs.  (Pls.' Counterstatement ¶¶ 47-48; Dep. of Cynthia Transue, Aug. 23, 2005, Doc. 140-5, at 55: 1-13.)  Plaintiffs' claim against Transue arises only from the fact that she did not reinstate Plaintiffs in 2002, when she knew they had been removed from the lists and while she still was Rice's immediate supervisor.  (Pls.' Counterstatement ¶ 47.)

Though Plaintiffs have adduced evidence that Defendant Transue acquiesced in Rice's initial decision to remove Plaintiffs from the referral lists, the only evidence they have submitted that she had actual knowledge that Rice's decision involved any unconstitutional conduct is that she was copied on Rice's letter to Schlier outlining the reasons for removal.  Plaintiffs argue that the letter "on its face violated the First Amendment because it said that sending invoices was a reason for removal."  (Pls.' Br. in Opp'n to Mot. for Summ. J., Doc. 136, at 30.)  That letter, however, listed four reasons for removal, so even assuming that Plaintiffs' invoices were constitutionally protected activity, Defendant Transue had no reason to think that but for the invoices, Plaintiffs would not

have been removed for one of the other three (3) reasons given, each which were tied to

language of the removal provisions in Field Regulation 6-2.  Plaintiff Schlier stated that he

talked to Transue after receiving his removal letter (Schlier Dep., Doc. 145-5, at 132: 3-

11.), but unlike with Defendant Miller, Plaintiffs have adduced no evidence that during this

conversation, Schlier alerted Transue that the removal may have been motivated by

retaliation for constitutionally protected conduct.  The record, even viewed in the light

most favorable to Plaintiffs, suggests that even if Transue had not been aware that

Plaintiffs' invoices were one of the reasons for their removal, she still would have made

the same decision to concur in Rice's determination.  The third prong of the retaliation

analysis is thus satisfied.  For this reason, no disputes of material fact remain with regard

to Plaintiffs' First Amendment claim against Defendant Transue and the Court will grant

the motion for summary judgment in her favor.


### (iv) Mr. Robb

The substance of Plaintiffs' claim against Joe Robb, director of the Bureau of

Vehicle Management at the PSP, is that he disapproved Schlier Towing's applications to

renew its status as an approved vendor for automotive service when he knew that the

reason Plaintiffs had been removed from the towing referral lists because of protected

activity.  (Pls.' Br. in Opp'n to Mot. for Summ. J., Doc. 136, at 30-31.)  Regardless of what

Defendant Robb knew, Plaintiffs have adduced no evidence to suggest that retaliation

was a substantial factor motivating his action.  Furthermore, Defendants have put forth

evidence in support of the third prong of the retaliation inquiry: Mr. Robb wrote a letter to

Schlier indicating that he rejected Schlier's applications because he was instructed to do

so.  He stated, "[u]pon further conversation with our Office of Chief Counsel and State Police's Office of Chief Counsel, we have been instructed to disapprove all of your applications." (Letter from Joe M. Robb, Director, Bureau of Vehicle Management, to Wrecker's International, Inc. (May 28, 2003) Doc. 122-17.)  This evidence indicates he would have made the same decision – to follow instructions – regardless of his knowledge of any protected activity by Plaintiff, so no disputes of material fact exist and Defendants' motion for summary judgment in favor of Joe Robb will be granted.

### B. Plaintiff's Fourteenth Amendment Claim

Defendants move for summary judgment on Plaintiffs' Fourteenth Amendment claim, which Plaintiffs assert against all Defendants except Colonel Miller and Ms. Sharp. In this claim, Plaintiffs have asserted that Field Regulation 6-2 [FR 6-2] (Doc. 53-2) expressly created a property interest, within the meaning of the Due Process Clause, in Plaintiffs' legitimate expectation of a continued relationship with the State Police to provide towing services.  (Second Am. & Supplemental Compl., Doc 67 ¶ 63.) Specifically, they argue that because the regulation set forth valid reasons to suspend towing operators, it created a "for cause" standard for suspension or removal and that Plaintiffs' compliance with PSP requests to take certain actions as part of the application procedure constitute consideration as a matter of contract law, entitling them to a property interest in remaining on the PSP towing referral lists.  (*Id*. ¶¶ 64-70.)  They claim that their right to due process under the Fourteenth Amendment was violated because they were removed from the PSP lists without an opportunity to be heard on the matter.

(*Id.* ¶¶ 69-74.)

Plaintiffs had a property interest in remaining on the referral lists only if they had "a legitimate claim of entitlement" to remain on the lists.  *Roth v. Bd. of Regents*, 408 U.S. 564, 577 (1972).  The Supreme Court has held that property interests "are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure benefits and that support claims of entitlement to those benefits."  *Id.*  The existence of a property interest here is an issue of state law.  *See Piecknick v. Pennsylvania*, 36 F.3d 1250, 1256 (3d Cir. 1994) (examining state police towing policy and applicable statutes and regulations to determine whether a towing operator had a property interest in receiving certain towing assignments).  A property interest can be created under state law either expressly by statute or regulation, or arising from government policy or a mutually explicit understanding.  *See id.*

Pennsylvania law distinguishes between regulations, which must be reviewed by the Department of Justice, filed with the Legislative Reference Bureau, and submitted to the Independent Regulatory Review Commission (IRRC) prior to being promulgated, from "mere 'policy amendments' or 'internal ... management decisions,' ... [or decisions] that are inherently committed to the agency's sound discretion and that cannot reasonably be subjected to the 'normal public participation process.'"  *See Small v. Horn*, 722 A.2d 664, 668-69 (Pa. 1998).  Plaintiffs do not dispute that FR 6-2 is an internal regulation adopted by the PSP, and do not put forth evidence that it is a regulation with the force of law that has been through Department of Justice and IRRC approval.  (*See* Defs.' Statement ¶ 3;

Pls.' Counterstatement ¶ 3.)  Like the provision upon which the plaintiffs in *Piecknick* attempted to rely, FR 6-2 is "a guideline ... not a regulation with any force of law."  *See* 36 F.3d at 1256.  Like the guideline in *Piecknick*, FR 6-2 is "no more than a policy statement setting forth procedures that state troopers should follow when handling towing calls." *See id.*

But the guideline, or a mutual understanding between Plaintiff and the PSP, could nonetheless create a property interest if it is  "definite enough."  *See Piecknick* , 36 F.3d at 1257.  The court in *Piecknick* found the guideline there, and any claim of a mutual understanding between the parties, was not definite enough to create a property interest in the towing company.  The guideline, the court noted, did not make any commitments; although it assigned certain companies to certain zones, it stated only that the trooper would call the nearest available service on a rotational basis.  *Id.* at 1256.  It did not "create an enforceable contract ... or otherwise give[]any particular towing service a right to receive all the towing business along the highways adjacent to or in any particular zone.  It is too vague and indefinite for that purpose."  *Id.*  In its discussion, the *Piecknick* court distinguished a case from the Fourth Circuit Court of Appeals, *Pritchett v. Alford*, 973 F.2d 307 (4th cir. 1992), which did find a property interest existed.  There, a regulation directed that rotation lists for wrecking service providers "be administered fairly and in a manner designed to ensure that all wrecker services on the list have an equal opportunity to the towing business arising from the rotation list."  *Id.* at 317.

*Pritchett* is distinguishable from the instant case not only because it involved a true regulation as opposed to a policy statement, but also because FR 6-2 does not provide

for fairness and equal opportunity for service providers.  Neither the purpose of FR 6-2 nor its provisions creates such an entitlement to procedural fairness as the regulation in *Pritchett* did.  For instance, FR 6-2's stated purpose is "to establish policy and procedures governing the provision of assistance to individuals on the highway and the selection of towing services when a damages or disabled vehicle must be removed from the highway, thereby ensuring the free, safe, and efficient movement of vehicles."  (FR 6-2, Doc. 53-2, § 2.01.)  Its stated policy is "to provide necessary assistance to individuals in need in a timely, efficient, and safe matter.  It is also the policy of the Department not to recommend a towing service."  (*Id.* § 2.02.)  The guideline is designed to provide for the safety of motorists, not the business interests of towing service providers.  The field regulation does state that suspension from the referral lists shall not exceed three (3) years and requires that notice of suspension from referral lists be sent to the suspended towing service.  (*Id.* § 2.07.)  While calling for notice, however, the regulation does not provide for any kind of hearing.  This Court has held in the past that a statute that provided "extensive procedural protections ... including the right to demand a public hearing and the right to appeal" created a property interest.  *Truhe v. East Penn Twp.*, No. 05-CV-1253, 2007 WL 184890, at *6 (M.D. Pa. Jan. 19, 2007).  By contrast, the omission of a right to a hearing does not create reasonable expectations that a property interest exists.  Further, the provision upon which Plaintiffs rest the crux of their argument, section 2.07(C), states: "The following are considered to be valid reasons for the suspension of a towing service:" and goes on to list six (6) reasons.  This provision, tellingly, does not state that "the following are considered to be *the* valid reasons" or "*the*

*only* valid reasons."  For the foregoing reasons, FR 6-2 does not create an entitlement to Plaintiffs' continued inclusion on the referral lists.

Further, Plaintiffs' argument that the towing regulation and their compliance with it creates an enforceable contract terminable only "for cause," is undercut by the fact that Pennsylvania law "presumes that a contract for services having no specific term is terminable at will." *Piecknick*, 36 F.3d at 1259.  Even if the list of appropriate reasons for suspension from the list did overcome the presumption that any agreement between the parties was terminable at will, guidance from the Eastern District of Pennsylvania suggests the Fourteenth Amendment would still not be implicated: "'We do not read *Loudermill*, or the Third Circuit's decisions such as *Unger* and *Reich*, as holding that commercial contracts terminable only for cause automatically implicate the Fourteenth Amendment.'  Only those public contracts involving 'extreme dependence' or 'permanence' rise to a protected status.'" *Rite Aid of Pennsylvania, Inc. v. Houstoun*, 998 F. Supp. 552, 530 (E.D. Pa. 1997) (citing *Vartan v. Nix*, 980 F. Supp. 138, 141 (E.D. Pa. 1997)).  Extreme dependence and permanence are not present here, and more important, the contractual dispute underlying this action suggests that no mutual understanding between Plaintiffs and the PSP existed that would create a protected property interest.

For the foregoing reasons, Defendants' motion for summary judgment on Plaintiffs' Fourteenth Amendment claim will be granted.

**C. Defendants Are Not Entitled to Qualified Immunity**

Defendants assert that they are entitled to qualified immunity from Plaintiffs'

claims.  The doctrine of qualified immunity provides "government officials performing

discretionary functions ... [a shield] from liability for civil damages insofar as their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A defendant

has the burden to establish that he is entitled to qualified immunity.  *See Beers-Capitol v.

Shetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001).  The qualified immunity inquiry proceeds

in two steps.  First, the court must determine whether the facts in the summary judgment

record, viewed in the light most favorable to the Plaintiffs, show a violation of

constitutional rights.  The discussion of Plaintiffs' First Amendment claims in the

foregoing sections specifies the material facts that are in dispute and explains their

materiality, as required by *Forbes v. Twp. of Lower Merion*, 313 F.3d 144, 146 (3d Cir.

2002).  As that discussion indicates, the evidence in the record, "[t]aken in the light most

favorable to the party asserting the injury, show[s] [Defendants Rice, Miller, and

Dougalas]'s conduct violated a constitutional right."  *See Saucier v. Katz*, 533 U.S. 194,

201 (2001).

Second, the court must determine whether those rights were clearly established.

As this Court stated in its previous Memorandum and Order of February 16, 2006 (Doc.

29), Plaintiffs' rights were clearly established.   "A reasonable official knows that

retaliating against ... [an individual] for the exercise of his First Amendment right to

petition the government for redress of grievances and of his right to free speech

constitutes a violation of the ...[individual's] constitutional rights." *Floyd v. Dugal*, No. 99-1616, 2003 U.S. Dist. LEXIS 24025, at *19 (E.D. Pa. Dec. 16, 2003); *see also Mitchell v. Street*, No. 04-3213, 2005 U.S. Dist. LEXIS 17156, at *20-21 (E.D. Pa. Aug. 17, 2005) (recognizing that the constitutional right to be free from retaliation for petitioning government for redress of grievances is clearly established).

Defendants argue that the law is not clear that the specific action of removing a business from a referral list can be a violation of the First Amendment. (Defs.' Br. in Supp. of Mot. to Dismiss, Doc. 121, at 14.) But, "[u]nder *Mt. Healthy* and its progeny, an otherwise legitimate and constitutional government act can become unconstitutional when an individual demonstrates that it was undertaken in retaliation for his exercise of First Amendment speech." *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997). The Supreme Court's admonition to determine the contours of rights in a particularized, more relevant sense "is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Anderson v. Creighton* 483 U.S. 635, 640 (1987). The unlawfulness of Defendants' actions was apparent in the light of pre-existing law, *see Creighton*, 483 U.S. at 640, because in First Amendment retaliation cases, "the motives of government officials are indeed relevant, if not dispositive," and is more significant than the particular form retaliation takes. *Davila*, 125 F.3d at 161. Because the record before this Court, viewed in the light most favorable to Plaintiffs, indicates that Defendants Rice, Miller, and Dougalas violated Plaintiffs' clearly established rights, they are not entitled to qualified immunity.

**CONCLUSION**

Because questions of material fact exist regarding the liability of Defendants Rice and Miller for First Amendment retaliation, Plaintiffs' motion for partial summary judgment will be denied.  Because no claims have been made against Defendant Sharp, she will be dismissed from this action.  Because questions of material fact exist regarding whether Defendants Rice, Miller, and Dougalas, retaliated against Plaintiffs for exercise of their First Amendment rights, Defendants' motion for summary judgment on the First Amendment claim in Count I, as to those Defendants, will be denied.  Because the evidence in the record, even resolving all disputes of material fact in favor of Plaintiffs, is not sufficient to make out a claim of First Amendment retaliation against Defendants McGuire, Transue and Robb, Defendants' motion for summary judgment on the First Amendment claim in Count I, as to those Defendants, will be granted.  Because Plaintiffs did not have a property interest protected by the Fourteenth Amendment, Defendants' motion for summary judgment on the due process claim in Count II will be granted.  And because the evidence in the record, viewed in the light most favorable to Plaintiffs, shows that Defendants Rice, Miller, and Dougalas violated Plaintiffs' clearly established rights, they are not entitled to qualified immunity.  The remaining claims in this case are the First Amendment retaliation claims against Defendants Rice, Miller, and Dougalas.

An appropriate order follows.


October 9, 2007                                        /s/ A. Richard Caputo
Date                                                          A. Richard Caputo
                                                                 United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

JIMMY A. SCHLIER, WRECKERS
INT'L, INC. d/b/a SCHLIER'S TOWING
& SERVICE CENTER,                                    CIVIL ACTION No. 3:04-CV-1863

     Plaintiffs                                              (JUDGE CAPUTO)

          v.

CAPTAIN JOHN G. RICE, et al.,

     Defendants.

**ORDER**

Now, this 9th day of October, 2007, it is **HEREBY ORDERED** that the parties

motions for summary judgment are **GRANTED** in part and **DENIED** in part, as follows:

(1) Plaintiffs' motion for partial summary judgment against Defendants Rice and

Miller is **HEREBY DENIED**.

(2) Defendant Sharp is **HEREBY DISMISSED** from this suit.

(3) In Count I, Plaintiffs' First Amendment claim, Defendants' motion for summary

judgment in favor of Defendants Rice, Miller, and Dougalas is **HEREBY DENIED**.

Their motion for summary judgment in favor of Defendants McGuire, Transue, and

Robb is **HEREBY GRANTED** and those claims are dismissed.

(4) In Count II, Plaintiffs' Fourteenth Amendment due process claim, Defendants'

motion for summary judgment is **HEREBY GRANTED** and that claim is dismissed.

                            /s/ A. Richard Caputo
                            A. Richard Caputo
                            United States District Judge